**In re DIVERSIFIED ENERGY VENTURE, a Pennsylvania corporation, Debtor.**

**Viper Mining Company, Movant,**

v.

**Diversified Energy Venture, a Pennsylvania corporation, Respondent.**

**Bankruptcy No. 02–27659 BM. Motion No. 03–0415M.**

United States Bankruptcy Court, W.D. Pennsylvania.

July 12, 2004.

Joseph P. Nigro, Esq., Nigro & Associates, LLC, Pittsburgh, PA, for Debtor.

Reed J. Davis, Esq., Davis, Davis Attorneys PC, Pittsburgh, PA, for Viper Mining Company.

### MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

Two matters are before us at this time.

The district court has remanded an order granting Viper Mining Company relief from the automatic stay so that Viper Mining could proceed with a sheriff's sale of a portion of debtor's real property against which Viper Mining had a valid mortgage lien. We have been instructed to conduct an evidentiary hearing and to explain the basis on which relief from stay was granted.

In addition, debtor Diversified Energy Ventures, Inc. has brought a motion to reopen its bankruptcy case, which debtor voluntarily dismissed while this appeal was pending in the District Court.

We conclude for reasons set forth in this memorandum opinion that relief from the automatic stay was appropriate because debtor had no equity in the realty in question. In addition, said realty is not necessary for an effective reorganization as no reorganization is possible within a reasonable period of time. We further conclude that there is no reason to reopen debtor's chapter 11 proceeding in light of the reasons for which Viper Mining was granted relief from stay.

### – FACTS –

Debtor is in the business of mining development. It was incorporated in 1992.

On February 19, 1993, debtor purchased the assets of Shannopin Mine in a chapter 7 bankruptcy proceeding. The assets included sixty-one parcels of real property and various items of personalty. The purchase price was $927,143.00.

When it purchased the real property, debtor purchased only the surface rights. Debtor's principal, who owns sixty-one percent of debtor's stock, owns the subterranean mineral rights. Located on the property was a portal to an underground coal mine, a facility on a bank of the Monongahela River from which coal could

be loaded onto river barges, several buildings, and various pieces of equipment for moving and processing coal.

On February 25, 1993, debtor executed a promissory note in favor of one Kenneth Marino in the amount of $1,650,000.00. Payment in full of the amount of the note was due no later than one hundred and twenty days from February 25, 1993. The obligation was secured by two mortgages against the realty and UCC–1 financing statements covering the personalty.

When debtor failed to pay off the note by the due date, debtor and Marino entered into a forbearance agreement on July 9, 1993, which extended the due date of the note and postponed collection activities until July 26, 1993. If debtor was unable to pay the obligation in full by then, the assets were to be sold and the proceeds placed into an escrow account for the benefit of the mortgagee.

On March 1, 2000, after some seven years had passed without any payment on the promissory note, Marino commenced a foreclosure action. Debtor thereafter consented on March 17, 2000, to a judgment against it in the amount of $1,792,686.80. Marino in turn was required to account for any personal property belonging to debtor removed from the site. The consent judgment subsequently was entered on the record on April 4, 2000.

Shortly thereafter, on April 16, 2000, for valuable consideration Marino assigned to Viper Mining his rights arising under the note, the mortgage and the consent judgment. Viper Mining holds fourteen percent of debtor's shares of stock.

A sheriff's sale of twenty-eight of the sixty-one parcels of real property was scheduled to occur on July 19, 2002.

The sale was automatically stayed when debtor filed a voluntary chapter 11 petition of July 18, 2002. The schedules accompanying the petition listed the sixty-one parcels of real property as the only assets of the bankruptcy estate. Debtor averred, without supporting documentation, that the value of the parcels was $4,465,230.00. No personalty was listed as an asset on the schedules. Viper Mining was identified as having a disputed secured claim in the amount of $1,968,615.60 by virtue of its mortgage lien against the real property.

On August 5, 2002, less than three weeks after debtor had filed its chapter 11 petition, Viper Mining brought a motion for relief from the automatic stay so that a sheriff's sale of the above twenty-eight parcels of real property could go forward. The motion was denied on September 4, 2002, as premature. The thought was that debtor should have a reasonable amount of time to propose a plan of reorganization.

Debtor submitted a disclosure statement and plan of reorganization on December 27, 2002. A hearing on the disclosure statement was scheduled for February 27, 2003. In its proposed plan, debtor indicated that it would sell all of its assets and would use the proceeds to pay creditors in full.

On January 17, 2003, before the hearing on debtor's disclosure statement was held, Viper Mining brought a second motion for relief from stay with respect to the above twenty-eight parcels of real property so that a sheriff's sale of these parcels could take place.

We had previously reviewed the morning's workload and thirty-two of the forty-eight motions scheduled for that morning were defaulted. Those matters could be defaulted because no answer was filed, the parties agreed or the issue was crystal clear and ready for decision. The motion of Viper Mining for relief from stay was one of sixteen matters remaining for hearing that morning. Because of the number of

motions remaining to be decided that day, it was not possible for this court to conduct an evidentiary hearing on every pending matter. Because of the time constraints, the matter could not be rescheduled within the allowed thirty days as the following week's motions day and every motions day thereafter also contained approximately four dozen matters. The motion was granted after oral argument on February 11, 2003. No evidence was offered at that time. On the proceeding memo attached to the motion we indicated that the fair market value of the property in question was $729,000.00 while the amount of the lien against the property totaled somewhere between $1,7000,000.00 and $2,000,000.00.

Debtor filed a timely notice of appeal of the order granting Viper Mining relief from the automatic stay on February 21, 2003.

A hearing on debtor's disclosure statement was held as scheduled on February 27, 2003. The disclosure statement was not approved and debtor was directed to file an amended disclosure statement within fourteen days.

An amended disclosure statement and plan of reorganization were filed on March 13, 2003. In its amended plan, debtor proposed selling the remaining thirty-three parcels of real property and using the sale proceeds to pay its creditors in full. The amended disclosure statement was approved on March 19, 2003.

A hearing on plan confirmation was held on May 1, 1003. A review of the ballots cast revealed that debtor's proposed amended plan was not confirmable on a voluntary basis. Debtor provided no basis for a "cram down". When confronted with the choice of having its bankruptcy case converted to a chapter 7 proceeding or having it dismissed, debtor opted to have its case dismissed. An order to that effect was entered immediately after the hearing. Debtor did not appeal the order of dismissal.

In spite of the dismissal of its bankruptcy case and, without a concern as to whether there was a basis for jurisdiction or whether a "case and controversy" still existed, debtor pressed forward in the district court with its appeal of the order of February 11, 2003. Having the luxury of considering the matter at length, the district court issued a memorandum order one year later on March 17, 2004, wherein it concluded that the record on appeal contained no findings of fact and did not state the basis upon which Viper Mining was granted relief from stay. The matter was remanded so debtor and Viper Mining could submit evidence and we might make findings of fact and set forth conclusions of law.

One day later, on March 18, 2004, debtor brought a motion to reopen its bankruptcy case.

In compliance with the directive of the district court, an evidentiary hearing was held on April 26, 2004. Since then debtor and Viper Mining have requested and were granted approximately one month so as to submit proposed findings of fact and conclusions of law. The matter is now ready for decision.

## – DISCUSSION –

### Motion For Relief From The Automatic Stay.

Section 362 of the Bankruptcy Code provides as follows:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying or conditioning such stay–. . . .

(2) with respect to a stay of an act against property under subsection (a) of this section, if–

    (A) the debtor does not have an equity in such property; and

    (B) such property is not necessary to an effective reorganization.

11 U.S.C. § 362(d).

■ As the moving party, Viper Mining has the burden of proof on the issue of debtor's equity in the above property while debtor has the burden of proof as to all other issues, including § 362(d)(2)(B). 11 U.S.C. § 362(g).

The "classic test" for determining whether a debtor has any equity in property for purposes of § 362(d)(2)(A) focuses on comparing the total amount of all liens against the property and the current value of the property subject to the lien(s). *Nantucket Investors II v. California Federal Bank (In re Indian Palms Associates, Ltd.)*, 61 F.3d 197, 206 (3d Cir.1995). The term "equity" as it appears in § 362(d)(2)(A) is defined as the amount by which the value of a given property exceeds the total amount of the lien(s) or charges against it. *Id.*, 61 F.3d at 208. If this value is equal to or less than the amount of the liens, there is no equity.

■ All applicable liens are considered when determining the amount of equity, if any, retained by a debtor. Equity analysis for purposes of § 362(d)(2)(A) focuses on the value, above and beyond all secured liens against the property, that can be realized for the benefit of all unsecured creditors. *Id.*, 61 F.3d at 207.[1]

■ Debtor and Viper Mining offered starkly contrasting expert opinions con-cerning the value of the property at issue here.

Viper Mining's expert, whose commercial qualifications may be questionable, testified without specific objection that the twenty-eight parcels subject to its mortgage lien had an approximate value of $730,000. He relied upon comparable sales in arriving at this opinion. While his expertise is weighted in favor of the residential area, he did appear knowledgeable as to commercial values and accordingly, we give weight to his opinion.

Debtor's expert, by stark contrast, testified that the same twenty-eight parcels had an approximate value of $2,500,000. His opinion was based primarily on what debtor's principal hoped were sizeable coal reserves beneath the property. According to debtor's expert, the property provides a portal to several million tons of subterranean coal reserves. He opined that the price of said coal has only recently increased dramatically. It would take as long as ten years, he estimated, to exhaust these reserves. The property, he believed, could generate significant royalties for coal that others would mine. He further asserted that the property also was particularly valuable because it was adjacent to a river along which mined coal could be transported by barge.

Although each expert's valuation has problems, the value asserted by Viper Mining's expert is more credible than that asserted by debtor's expert.

Debtor's expert employed the income approach in arriving at his valuation. His utilization of this approach was based on the assumption that debtor would enjoy

---

1. The difference between the "equity cushion" for purposes of § 362(d)(1) and "equity" for purposes of § 362(d)(2)(A) is that the former is concerned with the value of the property above the amount owed to a creditor with a secured claim and any liens senior thereto, whereas the latter is concerned with the value in excess of all secured claims against the property. *Id.*, 61 F.3d at 207–08.

significant royalties due to the existence of substantial reserves of coal which could be taken out of subterranean mines through portals located on the property. This assumption is at best dubious for numerous reasons.

Debtor's expert had no first-hand knowledge and offered no documentary proof of how much coal there was beneath debtor's property. His estimate of the magnitude of the coal reserves instead was based exclusively on what debtor's principal, whose personal interest obviously would be furthered by overstating the size of the coal reserves, told him. This causes us to question the soundness of the assumption.

Moreover, there is reason to believe that his estimate as to the magnitude of the coal reserves overstates how much coal under debtor's property can be profitably mined. The coal reserves had previously been "first mined"—i.e., previously mined. Much of the available coal had already been taken out before debtor purchased the property in 1993. Serious question exists whether much coal can be profitably mined the second time around.

The mines in question are flooded to a depth of eight hundred feet. It is questionable whether sufficient water can be removed from the mine within a reasonable period of time to make it feasible to mine any coal at all. In addition, there are environmental problems with the property concerning acid runoff.

Finally, it is difficult to consider the income approach as the best methodology for determining the value of the twenty-eight parcels at issue here. The property has generated no income whatsoever since debtor purchased it more than eleven years ago. Even if we accept the estimate of debtor's expert as to the magnitude of the coal reserves present, his projection as to the amount of income debtor can expect

to earn from selling or leasing the property is little more than wishful thinking.

Were the property as valuable as debtor's expert claims, we would expect parties willing to purchase or to pay royalties for using the property to have come forward and expressed an interest in same. That this has not happened even though the price of coal has increased recently. We think that the parties in the business of mining coal do not share debtor's optimism. Aside from making vague allusions to parties with whom it has had discussions, debtor provided no concrete information which would lead us to conclude that anyone is seriously interested in purchasing or leasing debtor's property for this purpose.

The opinion of Viper Mining's expert as to the value of the twenty-eight parcels, by contrast, was credible. He did not employ the income approach but instead utilized the comparable sales approach. His estimate as to value was based on other comparable properties and not coal reserves whose existence well may be chimerical.

We conclude in light of the foregoing that the value of the twenty-eight parcels of real property at issue here is $730,00.00. Having so concluded, we next must determine whether debtor has any equity in these properties.

It is undisputed that the amount of the debt owed to Viper Mining by debtor as of March 17, 2000, was $1,792,686.80. A consent judgment in this amount was entered against debtor on April 4, 2000. Interest in an unknown amount has also accrued since than and should be added to the amount of the judgment.

The same consent judgment also required Kenneth Marino, the holder of the mortgage lien at the time, to account for any personal property belonging to debtor that was removed from the twenty-eight

parcels at issue here. Uncontroverted testimony, which we find credible, was offered at the evidentiary hearing that the value of the personalty removed was $50,000.00 at most.

There also was testimony that Viper Mining sold a portion of the property to a third party after Viper Mining had purchased it at a sheriff's sale on February 14, 2003. A credit in the amount of $100,000.00 was applied to the amount debtor owed to Viper Mining, thereby reducing the amount of the debt.

While we are not able to determine the exact amount of the debt owed to Viper Mining by debtor, we conclude after taking into account the value of debtor's personalty that was removed from its property ($50,000.00) and the amount credit given when Viper Mining Sold a portion of the realty to a third party ($100,000.00) that the amount of the debt approximates $1,642,686.80 plus any interest that has accrued in an unspecified amount since entry of the consent judgment ($1,792,-686.80—$150,000.00 = $1,642,686.80). This total amount, whatever it may be, exceeds the value of the property at issue here by at least $912,642,686.80 ($1,642,-686,80—$730,000.00 = $912,686.80).

We therefore conclude that debtor has no equity in the twenty-eight parcels of real property for purposes of § 362(d)(2)(A) of the Bankruptcy Code. The value of these parcels is considerably less than the amount of the mortgage lien held by Viper Mining.[2]

■ Having so determined, it remains to be determined whether the twenty-eight parcels are necessary to an effective reorganization for purposes of § 362(d)(2)(B). We conclude that they are not.

Along with another thirty-three parcels, the twenty-eight parcels at issue here comprise the totality of debtor's assets. That much is clear from the bankruptcy schedules. One therefore might be inclined to conclude on this basis that, if debtor is to reorganize, the twenty-eight parcels are necessary for purposes of § 362(d)(2)(B) and that the request of Viper Mining for relief from the automatic stay therefore must be denied.

■ This does not go far enough to satisfy § 362(d)(2)(B), which speaks of an *effective* reorganization. What is required is a showing that there is "a reasonable probability of a successful reorganization within a reasonable time". *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 376, 108 S.Ct. 626, 633, 98 L.Ed.2d 740 (1988). An effective reorganization must be one that is *in prospect. Id.*, 484 U.S. at 375, 108 S.Ct. at 633.

We conclude that an *effective* reorganization is not "in prospect" in this case but instead is highly unlikely.

In its rejected amended plan of reorganization submitted on March 13, 2003, debtor proposed selling the surface rights of the remaining thirty-three parcels to an unidentified buyer. No prospective buyer had been found by the time the plan was rejected and the bankruptcy case was dismissed on May 1, 2003.

Debtor intimated at the evidentiary hearing following remand that it again

---

**2.** Debtor's bankruptcy schedules list another mortgage in the amount of $250,000.00 granted in 1993 to a third party. The property subject to the mortgage is not identified. If this mortgage lien attaches to the same twenty-eight parcels of real estate to which the mortgage of Viper Mining attaches, the total amount of all liens against those properties increases by that amount and the difference between the amount of all liens against the property and the value of the parcels increases from $912,686.80 to $1,162,686.80 ($912,-686.80 + $250,000.00 = $1,162,686.80) plus applicable interest.

would seek to sell or lease the property, presumably including the twenty-eight parcels. Debtor's optimism in this regard is based on what it characterizes as a "bullish 2003–2004 coal market" in which the price per ton for coal is at a high point, where it is expected to remain "for a while".

Debtor's characterization of the coal reserves lying beneath its property is unfounded and overly roseate. It offered no evidence showing that the coal reserves are as substantial as debtor would have us believe. As was noted previously, the coal in question previously was "first mined". If the amount of coal remaining is as substantial as debtor would have us believe, we would expect debtor to have found a buyer before now. Eleven years have passed without one emerging. The reason for this, we conclude, is not hard to figure. No prospective purchaser or lessee shares debtor's optimism concerning the extent and value of the coal reserves.

In short, debtor's prospects of effectively reorganizing within a reasonable period of time are not very promising. Any plan of reorganization which is based on there being substantial coal reserves accessible through the above twenty-eight parcels is not likely to lead to an effective reorganization.

We therefore conclude in light of the foregoing that Viper Mining is entitled to relief from the automatic stay in accordance with § 362(d)(2) of the Bankruptcy Code.

### Motion To Reopen Debtor's Bankruptcy Case.

■ Debtor brought a motion to reopen its bankruptcy case the day after the dis-

trict remanded the motion of Viper Mining for relief from the automatic stay. We understand this to mean that debtor is asking not merely that we reopen its bankruptcy case to conduct the evidentiary hearing ordered by the district court, but instead is asking that we somehow "undo" the order dismissing its case so that it may resume its quest to reorganize.

Presumably debtor seeks to reopen its case pursuant to § 350 of the Bankruptcy Code, which provides as follows:

(a) After an estate is fully administered and the court has discharged the trustee, the court shall close the case.

(b) A case may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause.

11 U.S.C. § 350.

Debtor's bankruptcy case may not be reopened pursuant to this provision. Only a bankruptcy case that was closed pursuant to § 350(a) may be reopened pursuant to § 350(b). *France v. Lewis & Coulter (In re Lewis & Coulter)*, 159 B.R. 188, 191 (Bankr.W.D.Pa.1993)(citing *In re Income Property Builders, Inc.*, 699 F.2d 963, 965 (9th Cir.1982)).

Debtor's assets had not been fully administered in debtor's bankruptcy case; it instead was dismissed at debtor's option when it became clear that a confirmable plan was not likely and that nothing would remain for distribution to unsecured creditors if the case were converted to a chapter 7 proceeding.[3]

■ The matter does end there. We would not reopen debtor's bankruptcy so

---

3. An entry on the docket that the case had been:closed" refers only to the administrative act of closing the case file, not to a closing for purposes of § 350(a). The entry reflects only an internal operating procedure in the clerk's office. See *In re Lewis & Coulter*, 159 B.R. at 191 n. 4.

that debtor may resume its quest even if § 350(b) were the appropriate vehicle for reopening a case that previously was dismissed instead of closed.

We determined previously that it was highly unlikely that debtor would effectively reorganize. Because of this, we see no point to "reopening" that bankruptcy case so that debtor may continue its quest to reorganize. Moreover, no legitimate bankruptcy purpose would be served in having the case reopened and then converted to a chapter 7 proceeding. Because the amount of the debt owed to Viper Mining far exceeds the value of the property at issue here, no funds would be realized from their liquidation with which to pay the allowed claims of unsecured creditors. Reopening debtor's case would require us to disregard our previous determination and, like debtor, "to dream the impossible dream".

We conclude in light of the foregoing that debtor's motion to reopen its bankruptcy case so that it may resume its quest to reorganize must be denied.

An appropriate order shall issue.

### ORDER OF COURT

**AND NOW**, at Pittsburgh this *12th* day of *July*, 2004, for reasons set forth in the foregoing memorandum opinion, It hereby is **ORDERED, ADJUDGED**, and **DECREED** that the motion for relief from the automatic stay by Viper Mining Company, Inc. be and hereby is **GRANTED**. It further is **ORDERED, ADJUDGED**, and **DECREED** that the motion to reopen by debtor Diversified Energy Ventures be and hereby is **DENIED**.

It is **SO ORDERED**.